**Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**SCOTT L. BARNHART**
Keffer Gilley Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**DAVID J. KARNES**
**TARA M. SMALSTIG**
Dennis, Wenger & Abrell, P.C.
Muncie, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE PATERNITY OF A.W., T.W., | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 68A05-1202-JP-59 |
| | ) |
| J.P., | ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE RANDOLPH CIRCUIT COURT
The Honorable Jay L. Toney, Judge
Cause No. 68C01-0101-JP-7

**August 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

T.W. ("Mother") appeals an order granting J.P. ("Father") custody of their child, A.P. We affirm.

**Issues**

Mother presents two issues for review:

I.    Whether the trial court clearly erred by modifying custody; and
II.   Whether the order is ambiguous as to modification of legal custody.

**Facts and Procedural History**

A.P. was born on January 8, 2001. Upon Father's petition, A.P.'s paternity was established in December of 2001. At that time, the parents agreed that Mother would have custody of A.P.

In December of 2010, then nine-year-old A.P. ran to the home of neighbor Dana Deffendall ("Deffendall") to telephone his maternal grandmother for assistance. He told C.W. ("Grandmother") that "mommy's drunk and being very mean." (Tr. 178.) When Grandmother arrived at Mother's home, she found Mother "so drunk and bouncing off walls and threatening to kill herself." (Tr. 178.) Grandmother summoned Father to come get A.P. so she could try to calm Mother. Mother refused to go to counseling.

Several times over the spring of 2011, A.P. ran to Deffendall's house, "scared and crying." (Tr. 35.) Deffendall took A.P. home, worried about Mother's drinking, but Mother denied alcohol use. In May of 2011, Grandmother moved in with Mother and A.P. to help out financially and assist with A.P.'s care. One evening, Grandmother came home and A.P. met her outside, asking for help because his mother had been drinking and was preparing to

2

take him to a Boy Scouts meeting. When Grandmother confronted Mother, she demanded that Grandmother leave. Grandmother decided to contact Father and assist him in trying to obtain temporary custody of A.P.

Father filed a petition for an emergency hearing and temporary custody. On October 13, 2011, the trial court conducted an emergency child custody hearing and granted Father temporary custody of A.P. Mother sought personal counseling, complied with a court order for an alcohol assessment, and then moved to dismiss the temporary order. Father requested formal modification of A.P.'s custody. The trial court conducted hearings on December 12 and 20, 2011, and January 10, 2012. On January 10, 2012, the trial court entered an order modifying A.P.'s custody to Father. Mother now appeals.

**Discussion and Decision**

I.   Custody

In modifying custody, the trial court found that Mother had a long-term alcohol addiction and history of refusal of treatment or lack of success in treatment. However, the trial court also found that Mother has sought counseling and "seems to be making some progress." (App. 20.) Mother now contends that the trial court abused its discretion and that the modification order is clearly erroneous. More specifically, Mother points out that she did what the court wanted her to do, she is a fit parent, and A.P. wants to live with her.

Indiana Code Section 31-17-2-21 provides that a court may not modify a child custody order unless the modification is in the best interests of the child and there is a substantial change in one or more of the factors that the court may consider under section 8 when it

3

originally determines custody.  Section 31-17-2-8 sets forth factors to be considered by the

trial court, providing in relevant part:

> The court shall determine custody and enter a custody order in accordance with
> the best interests of the child.  In determining the best interests of the child,
> there is no presumption favoring either parent.  The court shall consider all
> relevant factors, including the following:
>
> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's
> wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
> (A) the child's parent or parents;
> (B) the child's sibling;  and
> (C) any other person who may significantly affect the child's best interests.
> (5) The child's adjustment to the child's:
> (A) home;
> (B) school;  and
> (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either parent.
> (8) Evidence that the child has been cared for by a de facto custodian[.]

Judgments in custody matters will typically turn on essentially factual determinations.

Baxendale v. Raich, 878 N.E.2d 1252, 1257 (Ind. 2008).  We do not reweigh evidence or

consider witness credibility, and will set aside a judgment only when it is clearly erroneous.

Id.  "We will not substitute our own judgment if any evidence or legitimate inferences

support the trial court's judgment."  Id. at 1257-58.  This doctrine is reinforced by the

concern for finality in custody matters.  Id. at 1258.

A.P. had been in Mother's physical custody since birth, with significant assistance

4

from Grandmother.[1] A.P. testified that he wanted to return to Mother's home. However, the evidence presented to the trial court reveals that A.P. had assumed caretaking roles that were not age appropriate. His grandmother and her former boyfriend each testified that A.P. had been a very independent child, tending to himself as Mother had typically spent many hours isolated in her bedroom. A.P. had been placed in the position of trying to stop his mother from driving him when she was under the influence of alcohol. He had been forced on multiple occasions to seek assistance from a neighbor and was helpless in the face of Mother's suicide threats, raging, and refusal of treatment. He had recently written a letter (requested as part of Mother's current treatment) stating that he "wanted to take care" of his mother's needs and help her. (Tr. 117.)

Mother had a history of cutting A.P. off from sources of support. She had denied him contact with Grandmother, with Father, and with Deffendall after they had intervened and challenged Mother regarding her alcohol use. Mother had recently spoken to A.P. of "vengeance" that would be coming to Father, Grandmother, and Deffendall. (Tr. 109.) According to A.P.'s testimony, Mother had said that she did not want to talk to Grandmother or even "look at her," although A.P. could see her in the future. (Tr. 110.)

Mother has commendably sought mental health treatment. She testified that she recently sought treatment for personal issues but, once in counseling, began to address her use of alcohol. She had completed eighteen weeks of alcohol abuse treatment and eleven personal counseling sessions. Nonetheless, there is abundant evidence from which the trial

---

[1] For example, A.P. remained with Grandmother while Mother served nine months of weekend incarceration in a federal prison.

5

court could conclude that Mother needs additional treatment before resuming full-time parental responsibilities. In her testimony, Mother minimized her history of alcohol abuse, essentially claiming that she had completed a treatment program in 2003 (after a driving while intoxicated conviction), attended aftercare, maintained long sobriety, and had a relapse in 2010.

However, several other witnesses indicated that Mother had a long-term battle with alcohol abuse. Darren Tomlinson ("Tomlinson"), Grandmother's former boyfriend, testified that he had received a call in 2004 when Father was due to return A.P. from a visit but found Mother drunk. Tomlinson then went to Mother's home and persuaded Mother to let Father keep A.P. temporarily.

Darryl Frenzel ("Frenzel") testified that he had first met Mother at a bar in 2007 when he was on a date with Grandmother and Mother had stopped in after an Alcoholics Anonymous meeting. At Mother's request, Frenzel bought her at least five drinks that evening. He later employed Mother in a bar that he owned, but fired her after she came to work drunk and he had received multiple reports of Mother being drunk on the job. Frenzel described an instance in 2010 when Mother had called him and asked him to take A.P. to Grandmother. According to Frenzel, Mother had been drunk, screaming, and "out of control." (Tr. 153.) Frenzel estimated that on five or six occasions he had seen Mother so drunk that she would urinate on herself. She had urinated on Frenzel's vehicle seat, sofa, and garage floor. This took place from 2007 to 2011.

Grandmother testified that Mother's depiction of lengthy sobriety was "absolutely not

accurate." (Tr. 167.) After Mother disappeared in 2003, Grandmother had gone door-to-door hunting for her; she had sought the assistance of Mother's federal probation officer. In 2004, she had received many calls to pick up her daughter in a drunken state. Nonetheless, Mother refused treatment and threatened to bar Grandmother from having contact with A.P. if Grandmother challenged Mother. In 2006, Grandmother had moved in with Mother and A.P. According to Grandmother, Mother was "always in her bedroom." (Tr. 173.) The room reeked of alcohol, there were open alcohol containers in Mother's car, and Mother stashed alcohol under her bathroom sink. At times, Mother would begin or complete some treatment, but Grandmother estimated that the longest she could maintain sobriety was a few months.

Father testified that he worked as a DJ in a bar until a year prior to the hearing, when he had obtained his LPN license. He described seeing Mother come into the bar on weekends and drink until she had "wet her pants," then keep on drinking. (Tr. 202.)

In sum, the evidence suggests that A.P. is strongly bonded with his mother but also that he feels responsible for her well-being. While Mother is to be commended for completing an eighteen-week intensive outpatient alcohol program, she has a long history of struggles with alcohol and relapse. There is ample evidence to support the trial court's conclusion that it is in A.P.'s best interests that Father be awarded custody. Mother's emphasis on the difficulty of A.P.'s adjustment and his declining grades merely presents a request to reweigh the evidence. We cannot do so. Baxendale, 878 N.E.2d at 1257. The custody modification order is not clearly erroneous.

7

## II.  Legal Custody

Mother asks that we remand the matter to the trial court for clarification of its custody order.  In particular, Mother complains that the trial court failed to specify whether the parents now share legal custody of A.P.

In the "Agreed Final Order as to Custody, Support, and Visitation," the parties specified that Mother was to "have custody of the parties' minor child."  (App. 65.)  No distinction was made as between physical and legal custody.  Father's petition for modification of custody likewise made no such distinction.  The trial court granted the petition for modification, effectively vesting Father with physical and legal custody.

### Conclusion

The custody modification order is not clearly erroneous.

Affirmed.

RILEY, J., and CRONE, J., concur.